**Opinion issued July 31, 2025.**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00919-CV

_____

## IN THE INTEREST OF C.L.M., A CHILD

---

**On Appeal from the County Court**
**Grimes County, Texas**
**Trial Court Case No. 35131-CCL**

---

## MEMORANDUM OPINION

M.M. ("Father") is appealing the trial court's final order appointing Father

and H.B. ("Mother") as joint managing conservators of their son C.L.M. ("Corey"),

and appointing Mother as the parent with the exclusive right to designate Corey's primary residence and to make educational decisions.[1]

In three issues, Father argues the trial court (1) committed reversible error by failing to make a finding of family violence and appointing Mother and Father as joint managing conservators, (2) abused its discretion by appointing Mother and Father as joint managing conservators and naming Mother as the parent with the exclusive right to designate Corey's primary residence and make educational decisions because the evidence demonstrated that Mother posed a risk of significant impairment to Corey's physical health or emotional development, and (3) was biased against him and thus deprived him of a fair and impartial trial in violation of his right to due process.

We affirm the trial court's final order.

## Background

Corey was four years old at the time of trial and Mother and Father are his biological parents. On June 19, 2020, Mother filed her Original Petition in Suit Affecting the Parent-Child Relationship requesting that she and Father be appointed as Corey's joint managing conservators and that she be designated as the conservator with the exclusive right to designate Corey's primary residence.

---

[1] To protect the identity of the minor child, we refer to him and his grandparents by pseudonym and we refer to his biological parents as Mother and Father. *See* TEX. R. APP. P. 9.8(b)(2); TEX. FAM. CODE § 109.002(d).

Father filed an original answer, and later, on March 15, 2021, he filed an Original Counter-Petition in Suit Affecting Parent-Child Relationship requesting that he be appointed as Corey's sole managing conservator, that Mother be denied possession, and that Mother be ordered to submit to a psychological evaluation and drug screen. Father requested the issuance of temporary orders appointing him as Corey's sole managing conservator and denying Mother access to Corey, or alternatively, ordering that Mother's periods of visitation with Corey be supervised, ordering a child custody evaluation, and ordering Mother to provide support for Corey and submit to a psychological evaluation.

On August 4, 2021, Father moved for an emergency hearing on his request for temporary orders and he noticed the hearing for September 2, 2021. That same day, the trial court signed an order setting Father's hearing for temporary orders on September 2, 2021. The hearing, which was rescheduled multiple times, finally occurred on October 8, 2021. The day before the hearing, Father filed a request with the trial court for additional relief including denying Mother possession and access to Corey "until successful treatment of drug abuse program and behavioral therapy is completed," and ordering Mother to submit to a ten-panel drug screen within forty-eight hours.

On November 9, 2021, the trial court signed temporary orders appointing Mother and Father as Corey's temporary joint managing conservators with Father

having the exclusive right to designate Corey's primary residence within Wilson County, Texas. The trial court denied Father's requests for Mother to be drug tested, for a child custody evaluation, and for Mother to undergo a psychological evaluation. The court enjoined Mother and Father from "disturbing the peace of the child or of any other party" and "communicating with each other in any manner other than through Our Family Wizard."

Two years later, the trial court held a one-day bench trial on September 13, 2023. At the conclusion of the trial, the trial court appointed Mother and Father as Corey's joint managing conservators and it granted Mother the exclusive right to designate Corey's primary residence within Grimes and Brazos Counties, Texas and to make educational decisions.

**Trial Proceedings**

Before opening arguments, Mother's counsel asked the trial court how it wanted the parties to allocate their time and witnesses during the one-day trial. The trial court stated:

> I will tell you my—without saying that you can't get in all the stuff. I'm really interested in what's happening since temporary orders. It's what I'm really interested in knowing. I—I went back, I looked at it, I can't say I remember everything that happened at the temporary orders back in '21, but I remember a good bit of it. No need to beat a dead horse. I mean, refresh my memory clearly, but I'm really interested to know what's been happening since the end of the last two and a half years, I guess. Obviously, I want to hear from both parties and then beyond that, whatever you think is most important.

4

Hearing no objections from the parties or any request for additional time for trial, trial commenced.

## Mother's Case in Chief

### A.   Mother's Testimony

Mother testified that she met Father "in 2012, 2014," when she was living in Karnes County, Texas.  Although she and Father separated when he moved to Midland, Texas for work, they reconnected in February or April 2015 and began a long-distance relationship.  At some point, Mother ended the relationship because Father was "being controlling . . . telling me what to wear," but they reconnected again after Father reached out to Mother in 2016.  Mother moved in with Father in Midland, Texas in late 2016.

In May 2018, Mother learned she was pregnant.  She was "very scared" to tell Father about her pregnancy initially because she knew "he did not want any [children] at that point."  When Mother told him she was pregnant, Father told her they "needed to get an abortion" and he "started calling abortion clinics."  Mother did not want to get an abortion, "but, ultimately, we went to get an abortion" in El Paso, Texas.  Mother testified that she cried the entire four-hour drive to the clinic and when she told Father she did not want to get an abortion, he told her "it was what was best for our relationship."  After the abortion, Mother felt "just emotionally terrible," and Father supported her "in his way."  Mother testified that their

5

relationship "crumbled" after the abortion, and she left Father a few months later in September 2018. Although she stayed in town at first because she wanted to try to work things out with Father, Mother moved back to her parents' home in Grimes County, Texas after Father told her that he "loved [her], but he wasn't in love with" her and he did not know if he wanted to marry her. After she moved back in with her parents, S.R.L.B. ("Sharon") and R.D.B. ("Rick"), Mother learned she was pregnant with Corey. She waited until after her doctor confirmed her pregnancy to inform Father because she knew "how [Father] felt about kids." She told Father she was pregnant and that she was not going to terminate the pregnancy.

Corey was born in April 2019 in College Station, Texas. Father was at the hospital with Mother for three days until Corey was born. In June or July 2019, Father asked Mother to move back in with him. Mother and Father became engaged to be married a few months later. Mother testified that during this time, Father "put [Corey] first by working all the time to give us a place to live and gave me the ability to be a mom." Father helped around the house and with Corey, but she never left Corey alone with Father, except for short strips to the grocery store or to "run into town." Mother was primarily responsible for caring for Corey.

Father, Mother, and Corey moved to Floresville, Texas in February 2020 where Father bought the home where he currently resides. Mother and Father broke up shortly after in May 2020. According to Mother, the day she left Father's home

in Floresville, she and Father had a big argument because she believed Father had been cheating on her. She testified Father "had cheated on [her] numerous times," and she wanted proof that Father was cheating on her again because Father had warned her that if they broke up, he would "take [Corey] away from" her. According to Mother, she felt that if Father was cheating, that was a threat that "he was going to leave [her]" and "take [Corey] away."

During the argument, Mother tried to grab Father's cell phone from him. Mother testified that she and Father "wrestled" for the phone because Father "didn't want to give it up." Mother testified she stopped when she noticed that Corey was watching them and had started screaming and crying. Father told Mother he was going to call the police, and he locked himself in the bedroom alone. According to Mother, Father took a shower and then left for work. Father told her to get out of his house and he left for work that morning without telling Corey goodbye. Mother packed, and she and Corey left that day and moved in with her parents in Grimes County. One month later, in June 2020, Mother filed her Original Petition in Suit Affecting the Parent-Child Relationship requesting that she and Father be appointed as Corey's joint managing conservators and that she be designated as the conservator with the right to designate Corey's primary residence.

When asked on cross-examination if she "admitted to tackling [Father] and being the aggressor [in] May []2020 because you were wanting to see [Father's]

7

phone," Mother testified that Father "fought back and we both fought. We both participated in that." Mother acknowledged that Father was trying to get away from her and told her he would call the police if she did not stop. Mother testified that Father "locked himself in his room, so I could not get to him while he took a shower" to "protect himself." When asked how many times she had "physically assaulted" Father, Mother testified she was unsure, but it was no more than five, "maybe" more than three. She testified that Father had also "pushed [her] and left bruises down [her]legs." She testified she had not mentioned it before trial because it happened before Corey was born and it had nothing to do with Corey.

Mother testified that after she and Corey moved out of Father's home in May 2020, she and Father were able to agree on a "very flexible" possession arrangement created to accommodate Father's work schedule. Father was working seven days on and seven days off. And they did not have "many issues with possession."

Mother acknowledged that she made some "very ugly" comments about Father during this time, and she did not behave well. Mother testified that Father had warned her that if she left, "he would take [Corey] away" from her and although she was "always trying to avoid that," she felt she "ended up causing it."

Mother was asked about an incident at a Walmart store parking lot in December 2020. When asked if she had "stood in front of [Father's] truck for an hour and a half" when they met at a Walmart parking lot to exchange possession of

Corey, Mother denied standing in front of Father's truck after taking Corey and putting him in her car. She testified that she only stood beside the truck while speaking to Father. When asked if she followed Father after leaving the Walmart parking lot, Mother testified that she was driving behind Father's truck because they were both exiting the parking lot to get on the highway.

Mother was asked about another incident in July 2021, when she and Father exchanged possession of Corey. Mother testified that she and Father took Corey to his medical appointment, and they argued after the appointment because Father wanted to go to Huntsville, Texas to look at schools for Corey, but Mother "wouldn't go." Mother admitted that she left Corey alone in her unairconditioned car while she argued with Father. Later that same day, Mother and Father went to Corey's swimming lesson. Father, who was scheduled to take possession of Corey, tried to put Corey in his car seat after Corey's swim lesson ended. Mother "physically remove[d]" Corey from his car seat because she did not want Corey to leave with Father. When asked if she had been "pulling at [Corey's] arms and legs as [Father] was trying to put [Corey] in the car seat," Mother testified that she "may have been." Mother admitted to testifying at the temporary orders hearing that she "blacked out" during this incident.

Mother also testified that after drinking alcohol one evening in September 2021, she drove three hours to Father's home to see Corey. After arriving at Father's

9

home around 4 or 5 a.m., or possibly 2 a.m., Mother testified she lightly tapped on the windows to get Corey's attention because she wanted Corey to see that she was there. Mother did not go inside Father's house, and she denied banging on the windows. When asked if she believed she was in a hypomanic state that morning, Mother testified she was in distress. She said it was traumatizing to see her son inside the home where she had lived with Corey and Father as a family and not be able to go inside the home and touch Corey.

Mother testified that the possession exchanges had been difficult for her because "it was hard watching [her] family leave without [her]." She testified she was having a hard time "let[ting] my child go and coming to terms with my new life." When asked why she believed "this behavior [was] going to change now," Mother testified, "Because I've let go of my family and the vision that I had for the future. I've accepted that this is my life, and it will continue in separate homes, with [Corey] going back and forth."

Mother testified that Father withheld Corey from her without a court order from July 2021, until the trial court issued temporary orders on October 8, 2021. According to Mother, Father only allowed her to see Corey over FaceTime and in person twice during this two-and-a-half-month period. Mother testified it was very difficult for her to be away from Corey for so long and she felt like a "failure."

In August 2021, Father enrolled Corey in daycare. He did not list Mother as Corey's parent and falsely indicated on the forms that he had a custody document.

On October 8, 2021, the trial court held a temporary orders hearing. The court issued temporary orders appointing Mother and Father as Corey's temporary joint managing conservators and named Father as the conservator with the right to designate Corey's primary residence within Wilson County. The court did not make a finding of family violence or order Mother to submit to a psychological evaluation and drug screen as Father had requested. Mother testified that the court issued a standard possession order giving her possession of Corey on the Thursday preceding the first, third, and fifth Friday, and ordered the parent who had possession of Corey to make him available by telephone or FaceTime every day from 6:30 p.m. until 7 p.m. The court ordered that the exchanges of possession occur in La Grange, Texas, and it prohibited Mother from attending the exchanges.

Mother testified that she and Father continued having difficulty co-parenting after the temporary orders hearing. According to Mother, she and Father are "complete opposites" on parenting styles. She characterized their communication as "chaotic," and she admitted that she and Father needed to do a better job of keeping the other informed about Corey. Mother testified that she was not always able to speak to Corey over the phone or FaceTime when he was with Father, and she was not always kept informed about Corey's school activities. Mother and

11

Father also disagreed about certain aspects of Corey's medical care and there were times when Mother would take Corey to see a doctor while he was with her in Grimes County, even though she knew Father had already scheduled an appointment for Corey with his doctor in Floresville. Mother testified that she and Father did not always accommodate the other's request to exchange weekends or otherwise modify their periods of possession. She also admitted to calling Father and sending him text messages, despite being ordered to communicate with Father only through Our Family Wizard. Among other instances, Mother testified that she called Father several times on Corey's third birthday, even though she knew Father was having a family birthday party for him and Corey was not available for their nightly call. She admitted she had probably said "some pretty negative things about [Father's] parents" during this time, including accusing his mother S.D. ("Sally") of being emotionally abusive, but she had recently stopped talking about Father's family as Father had requested several times.

Mother testified about an incident involving her then-boyfriend, Mason Switzer. In January 2023, Switzer called Father and told him he needed to show Mother more respect. Switzer threatened to go to Wilson County to beat up Father. When asked if she knew Switzer had contacted Father, Mother testified that Switzer told her he was going to call Father, but she told Switzer not to call him because she did not want Switzer involved. Mother broke up with Switzer after she learned from

Father that Switzer had threatened Father with physical violence. Mother testified that she had "possibly" allowed Corey to be around Switzer one time after she learned that Switzer had threatened Father.

Mother, who produced her medical records subject to a confidentiality order, testified extensively about her mental health treatment. Mother sought treatment from Amy Azih, a physician's assistant, in May 2020, three days after she and Corey moved out of Father's home in Floresville. Mother, who had been previously diagnosed with ADHD and depression, had a prescription for Adderall and Wellbutrin. In her therapy notes from May 2020, Azih stated that Mother "is unable to stay on topic and focus on a question," and Mother "states she is not taking any Adderall today, but appears hypomanic." When asked if she told Azih that she was not taking any Adderall, Mother testified, "Maybe. Yes. I guess, I did tell her that." When Mother met with Azih again two weeks later in May 2020, Mother reported that she was no longer taking Adderall because she was concerned it would interfere with custody matters. Azih's therapy notes indicate that Mother's primary diagnosis was Bipolar II Disorder and Azih prescribed Mother Seroquel and Risperidal. Mother told Azih that she did not take the Seroquel consistently because it made her groggy. There is no indication in Mother's medical records that she filled the prescription for Risperidal. Mother stopped seeing Azih in August 2020. Mother testified that she saw two or three providers during this time, but it was always

through Zoom. Although Mother told Azih in May 2020 that she was no longer taking Adderall, Mother's records reflect that she refilled her prescription for Adderall in June 2020. Mother admitted that she was not taking her prescribed medication, and she was possibly misleading her doctor about her Adderall use.

Mother's medical records reflect that in late June 2020, she saw Dr. Jaime Benton with Baylor Scott & White for a medication refill. Benton prescribed Mother 90 mg per day of Adderall.

Mother changed providers and began treatment with Dr. Jeffrey Waguespack in March 2021. Mother, who was taking Zoloft, Wellbutrin, and Ritalin at the time of trial, testified that she had been prescribed several different medications since 2020, and, in January 2023, after trial and error, Dr. Waguespack achieved a medication regimen that worked for her. According to Mother, Dr. Waguespack is the only physician currently prescribing her medication, and she will remain under Dr. Waguespack's care and management of her prescriptions. Mother testified that she was honest with Dr. Waguespack and had been "very diligent in follow up as recommended by [her] physician."

Mother started therapy with Lauri Baker Brown in March 2021, but Mother changed therapists in June 2021 because she felt she needed more help than Brown was able to provide, and she wanted to try a different therapeutic approach. Mother began to see Rob Benson in August 2021 for "trauma therapy," but she is currently

14

receiving "traditional therapy" from Benson and intends to continue working with him. According to Mother, the therapy she receives from Benson, in conjunction with her medication, has helped her "tremendously" in dealing with her feelings towards Father. Mother testified that she believes that her work with Dr. Waguespack and Benson is helping her become a better person and a better parent.

When asked why she had not taken any steps to treat her Bipolar II Disorder, Mother testified that she initially did not pursue treatment because the diagnosis was made after she was "evaluated through Zoom, not in person" and when she told Benson that she "may have bipolar," Benson evaluated her, and he determined that she was not bipolar. Mother denied misleading Benson about the medications she was taking and testified that Benson may have neglected to write everything down. When asked if she had disclosed to Benson that she had been officially diagnosed with Bipolar II Disorder, as opposed to suspecting that she had the disorder, Mother testified that she "probably did" but it "just wasn't included in the notes." Mother admitted that she had testified during the temporary orders hearing that she had not been diagnosed with Bipolar II Disorder. Mother testified that although she had been diagnosed with Bipolar II Disorder, she was evaluated over Zoom and it "wasn't a thorough diagnosis."

In addition to continuing to seek treatment after the temporary orders hearing, Mother also obtained stable employment and housing. In August 2022, Mother

15

began working as an administrative assistant at Texas A&M University which provides her with health insurance, life insurance, disability insurance, and retirement benefits. She works from 8 a.m. to 5 p.m. Monday through Friday. Corey is enrolled in her health and dental insurance. And Mother has received favorable employment evaluations.

Mother testified that she lives on her own just down the road from her parents. She testified that Corey has his own bedroom, a full-sized bed, and lots of toys. Although he has his own room, Corey prefers to sleep with Mother. Mother has never heard Corey tell anyone that he does not have his own bedroom at her home. Mother testified that if Corey lived with her during the week, her mother, Sharon, would help her by dropping Corey off at school in the morning and picking him up in the afternoon, and watching Corey until Mother came home from work. Sharon had also been helping Mother by meeting Father for the exchanges of possession and Sharon would continue to do so in the future.

Mother has many relatives who live in or near Grimes County, including her parents Sharon and Rick, her grandfather, numerous aunts and uncles, and her cousins. Mother's extended family is a huge part of her support system. According to Mother, Corey is very close to Sharon and Rick, and he likes spending time with Mother's extended family and close family friends.

Mother, who acknowledged she had behaved badly during the months leading up to the temporary orders hearing, testified she had progressed and changed since then and that she was in a better point in her life. When asked why she believed her inappropriate behavior would not reoccur, Mother testified, "Because they haven't happened in months, and I'm in a totally different mind space than I was back then." Mother testified that regardless of whether Corey lived with her or Father, she wanted the court to include the electronic communication provision in the final orders because "it is very important to have contact with the other parent, especially when you're not with them." She believed it was "very important that [Corey] spend time with both of his parents." When asked what she would do going forward to be a better parent to Corey, Mother testified that she would continue going to therapy because it will still take effort on her part to be able to be "a good co-parent and to get over the learning curve of co-parenting and telling [Father] things."

## B.    Margery Kirshner

Margery Kirshner knows Mother and her family from church. Kirshner testified that Corey, who comes to church when he is living with Mother, is a happy healthy child who told her he likes going to school. According to Kirshner, Corey loves Mother's parents very much, and they love him, too. Kirshner testified that Mother and Corey have a very loving relationship, Corey is Mother's "pride and joy," and Mother spends as much time with Corey as she can.

## C.    Sharon

Sharon and Rick have been married thirty-six years.  Mother is their only child, and Corey is their only grandchild.  Sharon has not spent much time around Father since Corey was born.  Sharon visited Mother, Father, and Corey for Thanksgiving in 2019.  According to Sharon, Father helped with Corey when he was home, but he worked long hours, and Mother did most of the parenting.  Sharon testified that Mother is a "good mom," and Corey is Mother's "number one priority."

Mother and Corey moved into Sharon's home in May 2020, and they lived there for two months before Mother rented her own place nearby.  Sharon testified that she saw Mother and Corey almost every day.  When asked what she observed of Mother's parenting skills between May 2020 until the temporary orders hearing in October 2021, Sharon testified that Mother "did a very good job" with Corey and although Sharon helped, Mother took care of Corey most of the time.  Sharon testified that, since the temporary orders hearing, she has been helping Mother with the exchanges of possession by picking up and returning Corey to Father.  According to Sharon, the exchanges of possession have gone fairly well, except for one instance when Corey did not want to leave Sharon.  She testified that Corey is "very excited" when she picks him up from Father.

When asked if the transition between parents' homes is difficult for Corey, Sharon testified that she did not believe the change in possession was "very difficult"

for Corey. According to Sharon, Corey loves Mother's and Father's extended families, and he wants to be with both sides of his family. Sharon testified that Corey "has hit Mother" and "thrown the phone on the ground and not wanted to talk" to Mother, but Corey has done the same thing to Father, "he's hung up on him." Sharon did not know if Mother had ever hit Father, and she never witnessed any physical altercations between Mother and Father.

Corey has a loving and very good relationship with Mother's family, especially Rick, who is retired and watches Corey every Friday during Mother's periods of possession. Sharon testified that she would continue to help Mother with exchanges of possession in the future and she would help get Corey to school if he lived with Mother. Sharon testified that Mother is a "very good mother" who will take good care of Corey and Corey will thrive in her care, where he will be surrounded by Mother's large family whom he loves and with whom he is bonded.

### D. Father

Father testified that since the temporary orders hearing in October 2021, Corey has lived primarily with him in Floresville, Texas. He testified that Corey has a very close and loving relationship with Father's family members, especially Father's father. Father, who attends all of Corey's extracurricular activities, including tee ball and soccer, testified that he tries to be an active and engaged father

to Corey and a good role model for his son. Father testified that Corey is a "very intelligent little boy" who does well at the private school where Father enrolled him.

Father works at Conoco Philips. He works twelve-hour days—seven days on seven days off—and his commute to and from work is approximately forty minutes each way. Father's fiancée R.N. ("Rita") takes Corey to and from school when Father is working, otherwise, Father takes him to school. Before Rita, Father had a nanny who helped him with Corey.

Father asked the court to appoint him as Corey's sole managing conservator because his "main concern at the moment [was] the—the full rights for the medical. The miscommunication—lack of communication that we had between the doctor's appointments, canceling appointments, et cetera." Alternatively, Father asked the court to name him and Mother as joint managing conservators with Father having the exclusive right to designate Corey's residence without regard to geographic restriction because he needed the flexibility to move for work in the future. Father also asked the court to make a finding that Mother had committed family violence in the two years prior to the filing of the suit. He asked the court to make the same finding in its temporary orders, but the court declined to do so. Father asked the court to make the family violence finding because he wanted to bring the issue "back to the Court's attention." According to Father, Mother's "erratic behavior that we've been worried about is—is still there and still an issue." Father also asked the court

to require Mother to undergo a psychological evaluation, provide proof of medications and dosages prior to being able to drive with Corey, and order Mother to take medications as recommended by her therapist or doctor in the correct and prescribed dosages only. He asked the court to grant him the same relief in the temporary orders, but the trial court declined to do so.

When asked if there was anything he could have done better over the past three years, Father testified that he "could have always communicated better." Father acknowledged that he and Mother both had problems effectively communicating with one another regarding Corey, including Corey's educational and medical needs.

On direct, Father denied ever putting his hands on or physically assaulting Mother. He denied accidentally assaulting or hurting or bruising Corey. Father testified that Mother had falsely accused him of physical abuse multiple times, and he repeatedly asked her to stop. Father testified that since May 2020, Mother had lost her temper and physically harmed him in front of Corey "three or four different times," but he did not explain or give details about these incidents. According to Father, Corey has "sensory issues when voices start getting raised or tensions flare" and "he immediately starts shutting down and getting very upset." When Mother would get angry with Father, he would ask her not to do it in Corey's presence.

21

Father asked the court to require Mother to submit to a psychological evaluation and follow her doctor's or therapist's orders because he wanted to "make a better relationship" for him, Mother, and Corey. Father requested that the psychological evaluation occur before Mother was allowed to drive with Corey because of the July 2021 incident when Mother, who had Corey in her car, followed Father out of the Walmart parking lot after they had exchanged possession. Father testified that possession exchanges had been problematic because Mother would frequently prevent him from leaving the exchanges. According to Father, he and Mother would have "the same conversations" about their relationship—not Corey— and Father would try to calm Mother down for Corey's safety and "get everything settled down before we go our separate ways."

After the incident in July 2021, Father did everything he could do to get the court to issue temporary orders because he was concerned about Mother's "erratic behavior." He testified he did not provide Mother's information to the daycare where he enrolled Corey in August 2021, because he was worried that Mother might try to take Corey.

Father testified that he and Mother had struggled to co-parent Corey in other ways as well. According to Father, Mother refused to switch weekends of possession when Rita graduated, and Mother did not participate in any of Corey's school activities aside from attending the meet the teacher event at the beginning of

the school year.  Father tries to send Mother prompt updates on Corey's schedule of activities, along with passwords and login information.  When asked if Mother cooperates with him in the same manner, Father testified, "I wouldn't say so, but we do our best to communicate and make the best of the situation."

Father testified that he scheduled a doctor's appointment for Corey the weekend before trial and Mother tried to cancel the appointment.  Father also made well-check appointments for Corey in 2022 and 2023 and notified Mother.  In 2022, however, Mother took Corey for a well-check visit with another doctor the week before Corey's scheduled well-check in Floresville.  Father testified that Corey's well-check appointment in 2023 had to be rescheduled from April to June 1, and, after Mother learned of the June appointment, Mother scheduled a well-check appointment for Corey on May 5 in College Station.  Father was not notified about the appointments until afterwards.

Father asked the court to name him as the managing conservator with the exclusive right to make medical decisions for Corey because Mother had not conferred with him regarding Corey's medical appointments as she was required to do in the temporary orders.  Father testified that when he conferred with Mother, he notified her of all scheduled appointments and would inquire if she had any feedback or if she had concerns that she wanted him to raise at the appointment.  According to Father, Mother never requested his feedback.  Father testified that he was "sure

23

there would have been times where [he] could have communicated better" with Mother, but he did his "best to keep [Mother] involved in everything that's going on" in Corey's life, including Corey's school and extracurricular activities and medical appointments.

When asked if Mother had done anything in the last two years to make him feel that Mother would "attempt to co-parent and cooperate with [him] with making medical appointments," Father answered that she had not.

**Father's Case in Chief**

**A. Carmen Davila**

After Mother rested her case, Father's attorney attempted to call Corey's teacher Carmen Davila to testify, and the court inquired what she would be able to add. Father's counsel responded:

> Respondent's Exhibit—if I can find the number, there was a letter that she had written regarding [Corey] and some behavioral issues that she dealt with immediately following [Mother's] visitation. But she would also testify that [Mother's] been provided all this information. She's on the news portal. She received everything. There's been some testimony that contradicts that, so we would just like the school to be able to clear things up.

The trial court told Father's counsel he would give him "about ten minutes," stating

> By all means, you're not going to make a hill of a beans of difference. But—I mean, I've already heard a lot of back and forth, back and forth, about how these two don't get along and miscommunicate. That's abundantly freaking clear.

Father's counsel responded:

> MS. HULETT: If the Court doesn't wish to—they'll just rely on the exhibit?
>
> THE COURT: I'll rely on the exhibit.
>
> MS. HULETT: Okay.
>
> THE COURT: Although, I wonder if y'all really want me to sit down and read all this. Y'all might not get a ruling until sometime in December.

Davila's letter was admitted into evidence as RX 36. In her letter, Davila states in relevant part:

> I have noticed that when [Corey] returns from specific weekends, he does have trouble readjusting to his normal daily routine. He starts to act out and tries to test his teacher with behavior that is not common for him. After several days of readjusting back to his normal daily routine he is great, but then his routine is broken by missing school when he visits out of town. Upon returning, it is another cycle of helping him to readjust emotionally and behaviorally. I firmly believe that he can and will continue to succeed academically if he continues to be supported and loved at home and at school and continues to maintain his normal daily routines with his father. [Father] has been incredibly supportive of his son and of his son's education. He is always readily available when he is needed. From what I can see he provides a safe and loving environment for his son.

## B. Sally

Father's mother, Sally, testified that Father and Corey stayed at her home one weekend in "'20, late '20, early '21." According to Sally, Father had "an attack of his kidney stones" and she took him to the hospital. Sally could not take Corey with her to the hospital because it was during the Covid pandemic, so she called Mother

and asked her to pick up Corey. According to Sally, Mother was "sort of put off" about having to pick up Corey. When Mother arrived at Sally's home, she went to the family room and went "off on [Father]." Mother began "yelling" at Father and "slapping him around the chest." According to Sally, Father was in "pretty severe pain," and he held up his hands as Mother slapped him in the chest. Sally testified that Corey who was a "year and a half, maybe two" witnessed the incident and started crying. When asked if she had "witnessed these types of outbursts prior to this incident" Sally stated, "many times," but she did not discuss how or when these incidents took place. According to Sally, Corey "gets very withdrawn" and "very angry" when "these incidents are occurring," and he needs to be comforted.

Sally testified that Father is an amazing parent who has provided for all of Corey's needs by, among other things, feeding, clothing, and diapering Corey, hiring a nanny to help with Corey's care, and enrolling Corey in a private school. According to Sally, Father is "trying to give [Corey] the best—the best life that a child from separated parents can possibly have."

Father rested his case without attempting to call any additional witnesses or indicating he needed more time to present his case.

### Trial Court's Ruling

After hearing the parties' closing arguments, the trial court orally announced its ruling. Speaking to Mother, the trial judgment stated:

26

I was pretty hard on you at the last temporary orders hearing because your conduct was nuts. You scared me. And I quite frankly, didn't have much belief or hope that things were going to be significantly different if you want to know the truth. I came into this thinking this was going to be easy. Well, you made it hard because you've done pretty good. You haven't done perfect, but you've done pretty damn good. You've owned up to your screw-ups. You've focused on getting your life straight. You've done good. That's all I can say about it. And by doing that, you've made it a whole lot harder. If you would have just continued to be a screw up, my decision would have been easy. But you're making it hard on me.

. . .

I'm not going to enter a finding of family violence. I just don't think it's there, and I don't think it's necessary. It's time to move on, and I just don't think that facilitates moving on. So [Mother and Father] will remain joint managing conservators.

I am going to change custody and name [Mother] as the primary joint managing conservator with the sole decision to make decision on [Corey's] place of residence and [Corey's] place of school.

The trial court ordered a standard possession order for people living over 100 miles apart, ordered Mother to continue psychological counseling until her therapist released her from the treatment program, ordered Mother to continue taking her medication as directed, and ordered Father to pay child support.

On November 30, 2023, the trial court signed an "Order in Suit Affecting the Parent-Child Relationship" memorializing its ruling. On January 16, 2024, the trial court signed findings of fact and conclusions of law.

This appeal followed.

## Motion to Strike

Mother filed a motion to strike from the reporter's record the transcript of the October 8, 2021 temporary orders hearing and the portions of Father's appellate brief citing to the transcript of the hearing because the transcript was not admitted into evidence at trial. Mother argues that in addition to the temporary orders hearing transcript, Father's opening brief cites to other evidence that was not offered or admitted into evidence during trial including Father's affidavits attached to his Original Counterpetition in Suit Affecting the Parent-Child Relationship, his October 2021 request for relief, and a timeline of events Father prepared.

The record reflects that the trial court pre-admitted Father's exhibits RX 1 through RX 55, "with the exception of 54 and 13," and stated that the court would "deal with those [exhibits] at the time [they were] brought up." Respondent's Exhibit RX 54 is the transcript of the temporary orders hearing held in October 2021, and Respondent's Exhibit RX 13 is the timeline Father prepared. It is undisputed that Father did not offer Exhibit RX 54—the transcript of the temporary orders hearing—into evidence at trial. Because it was not admitted into evidence at trial, the hearing transcript was not properly before the trial court and cannot support the trial court's judgment. *See Moreno v. Perez*, 363 S.W. 3d 725, 736 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("The testimony taken at a previous trial cannot be considered by the trial judge in a subsequent trial unless it is admitted at that

trial."); *In re J.R.K.*, No. 06–10–00121–CV, 2011 WL 3242264, at *2 (Tex. App.—Texarkana July 8, 2011, no pet.) (mem. op.) (noting testimony at hearing on temporary orders was "not introduced or admitted as evidence at the final hearing" and concluding that "the evidence from the hearing on temporary orders could neither be considered by the trial court in reaching its final orders, nor by this Court on reviewing the final order").

Father argues that we can consider the affidavits attached to his Original Counterpetition in Suit Affecting the Parent-Child Relationship because the trial court took judicial notice of the file "which included two sworn affidavits by [Father] detailing multiple acts of family violence that occurred within two years prior to the suit being filed and during the pendency of the suit." While the trial court could take judicial notice of the fact that Father filed two affidavits, the court could not take judicial notice of the contents of Father's affidavits. *See In re Shifflet*, 462 S.W.3d 528, 539 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (stating trial court can take judicial notice that record was filed in case, but it cannot take judicial notice of truth of allegations in record); *see also Guyton v. Monteau*, 332 S.W.3d 687, 693 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("A trial court may not take judicial notice of the *truth* of factual statements and allegations contained in the pleadings, affidavits, or other documents in the file." (emphasis in original). Consequently, we cannot consider Father's affidavits in our review.

Father also argues we can consider Exhibit RX 13—the timeline he prepared—in our review, because the trial court admitted the exhibit as "a shorthand rendition of [Father's] testimony—a detailed timeline including the history of family violence." The record reflects that when Father offered RX 13 into evidence, the trial court admitted the timeline only as a demonstrative aid. ("I'll allow the shorthand rendition demonstrative aid [RX 13], to the extent that it shows a timeline of those items that are listed."). As such, RX 13 has no independent probative value:

> Physical (or nontestimonial) evidence includes real evidence, demonstrative aids, photographs, videos, and computer-generated animations and simulations. This evidence can be admitted under two theories of relevance: substantive and illustrative. Substantive evidence has independent probative value for proving a fact of consequence in the case—that is, its probative value does not depend on witness testimony. Illustrative evidence, on the other hand, is offered to help explain or summarize a witness's testimony or to put events and conditions into a better perspective and is not independently probative in determining the substantive issues in the lawsuit.

Rules 401–403. Special Applications, TX. Rules of Evid. Handbook Rules 401–403 (2025 ed.) (footnotes omitted).

Because the hearing transcript (RX 54), Father's timeline (RX 13), and Father's affidavits were not admitted into evidence at trial, the trial court could not

have relied upon them when it issued its judgment. We thus cannot consider these materials for purposes of our review.[2]

We grant Mother's Motion to Strike.

## Standard of Review

Father challenges the trial court's decision of conservatorship arguing the trial court reversibly erred by naming Father and Mother joint managing conservators and granting exclusive rights to Mother despite "uncontroverted evidence of [Mother's] intentional use of physical force" against Father and evidence Mother "posed a risk of significant impairment to the child's physical health and emotional development."

Conservatorship determinations made after a bench trial are reviewed for abuse of discretion and may be reversed only if the trial court acts in an arbitrary or

---

[2]  Although neither the transcript of the temporary orders hearing nor the timeline were admitted into evidence at trial, the trial court was aware of the evidence presented at the hearing and the events described in the timeline. The record reflects, however, that the trial court placed greater significance on the events that occurred after the hearing. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex. 2005) (stating trial court, as sole factfinder in bench trial, is sole judge of credibility of witnesses, weight to be given their testimony, and may accept or reject all or any part of their testimony and "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses"). Moreover, as we note in our analysis below, appellate courts must afford great deference to the factfinder regarding issues of credibility in custody cases, particularly with regard to issues of witness credibility. *See id.*; *In re A.D.T.*, 588 S.W.3d 312, 317 (Tex. App.—Amarillo 2019, no pet.) (stating courts "afford great deference to the factfinder on issues of credibility and demeanor" in conservatorship cases); *In re R.S.*, No. 01-18-00058-CV, 2020 WL 3393069, at *6 (Tex. App.—Houston [1st Dist.] June 18, 2020, no pet.) (mem. op.) (same).

unreasonable manner or without reference to any guiding rules of legal principles. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Legal and factual insufficiency are not independent grounds for assertion of error, but they are relevant factors in determining whether the trial court abused its discretion. *See In re J.J.G.*, 540 S.W.3d at 55.

In conducting a legal sufficiency, or "no evidence" review, we consider the evidence in the light most favorable to the trial court's judgment, disregarding all evidence and inferences to the contrary unless reasonable jurors could not do so. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810–11 (Tex. 2005). Anything more than a scintilla of probative evidence is legally sufficient to support the trial court's finding. *See In re J.J.G.*, 540 S.W.3d at 61. When reviewing whether the evidence was factually sufficient to support the trial court's judgment, we consider all the evidence and set aside the findings only if we find that they are so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *In re J.J.G.*, 540 S.W.3d at 62.

To determine whether the trial court abused its discretion, we apply a two-pronged test. We consider (1) whether the evidence was legally and factually sufficient to support the trial court's decision on conservatorship, and (2) whether the court erred in its application of discretion. *See In re J.J.G.*, 540 S.W.3d at 55.

A trial court does not abuse its discretion if it bases its decisions on conflicting evidence or if there is some evidence of substantive and probative character to support the trial court's decision. *Id.*

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819; *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The trial court may accept or reject all or any part of a witness's testimony. *City of Keller*, 168 S.W.3d at 819. Because of the fact-intensive nature of reviewing custody issues, appellate courts "afford great deference to the factfinder on issues of credibility and demeanor" because the factfinder "faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent." *In re J.J.G.*, 540 S.W.3d at 56 (quoting *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied)); *In re R.S.*, No. 01-18-00058-CV, 2020 WL 3393069, at *6 (Tex. App.—Houston [1st Dist.] June 18, 2020, no pet.) (mem. op.) (stating "an appellate court must afford great deference to the factfinder on issues of credibility and demeanor" when reviewing custody issues).

When there is conflicting evidence presented at trial, it is the province of the factfinder to resolve such conflicts. *Jordan*, 325 S.W.3d at 713. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume that it did so in favor of the prevailing

33

party. *Id.* It is not within the province of an appellate court to interfere with the factfinder's resolution of conflicts in the evidence. *See In re J.J.G.*, 540 S.W.3d at 56. While a factfinder cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted, the factfinder is the sole judge of credibility and "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses." *City of Keller*, 168 S.W.3d at 820.

## Conservatorship

Father argues the trial court abused its discretion because despite being "presented with uncontroverted evidence of [Mother's] intentional use of physical force against [Father]," it failed to make a finding of family violence and appointed Mother and Father as joint managing conservators. Father further argues that the trial court erred in appointing Mother and Father as joint managing conservators and granting Mother exclusive rights to establish primary residence and make educational decisions because "overwhelming evidence demonstrated that [Mother] posed a risk of significant impairment to the child's physical health or emotional development" thus rebutting the "presumption that appointment of the parents as joint managing conservators was in the child's best interest."

**Applicable Law**

The primary consideration in determining conservatorship and possession of and access to the child is the best interest of the child. TEX. FAM. CODE § 153.002; *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000). It is the public policy of this state to "assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child" and to "encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage." TEX. FAM. CODE § 153.001(a)(1), (3).

As a reflection of this public policy, Section 153.131 of the Family Code provides that "it is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." *Id.* § 153.131(b). That presumption is removed, however, and the trial court may not appoint parents as joint managing conservators, if the trial court makes a "finding of a history of family violence involving the parents of a child." *C.L.W. v. R.V.W.*, No. 01-21-00283-CV, 2023 WL 5109878, at *8–9 (Tex. App.—Houston [1st Dist.] Aug. 10, 2023, no pet.) (mem. op.) (quoting TEX. FAM. CODE § 153.131(b)); *see also In re J.J.G.*, 540 S.W.3d at 56. "Family violence" is defined as "an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily

35

injury, assault, or sexual assault, but does not include defensive measures to protect oneself." TEX. FAM. CODE § 71.004(1); *see also id.* § 153.004(g)(2) ("'Family violence' has the meaning assigned by Section 71.004").[3]

Section 153.004(a) further guides courts in determining how evidence of abuse impacts conservatorship decisions. Section 153.004(a) states that when considering whether to appoint a party as sole or joint managing conservator, the "court shall consider evidence of the intentional use of abusive physical force . . . by a party directed against . . . a parent of the child . . . committed within a two-year period preceding the filing of the suit or during the pendency of the suit." TEX. FAM. CODE § 153.004(a). Section 153.004(b) further provides that

> The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child.

*Id.* § 153.004(b). The term "physical abuse" is not defined. We thus construe it according to its common usage. *See* TEX. GOV'T CODE § 311.011(a). "Abuse" can have many definitions, but in the context of person-to-person contact, it means "physical maltreatment." *See* Webster's Ninth New Collegiate Dictionary 47

---

[3] When making conservatorship determinations, courts also are required to consider whether a parent "engaged in a history or pattern of family violence, as defined by Section 71.004 [or] a final protective order was rendered against" a parent "preceding the filing of the suit or during the pendency of the suit." *See* TEX. FAM. CODE § 153.005(c)(1), (3).

(1984); *see also Baker v. Baker*, 469 S.W.3d 269, 274 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("Based on the broad meanings of [family violence, as defined by the Family Code, and physical abuse], we conclude that an act by one spouse that is intended to result in bodily injury to the other spouse, and actually results in bodily injury to the other spouse, qualifies as both family violence and physical abuse.").

As the sole judge of the weight and credibility of the evidence, a trial court has broad discretion to determine what constitutes credible evidence of a history or pattern of physical abuse under Section 153.004(b). *See Alexander v. Rogers*, 247 S.W.3d 757, 761, 764 (Tex. App.—Dallas 2008, no pet.) (noting factfinder determines weight given to evidence presented); *Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.) (same). Because Section 153.004 does not define "history" or "pattern," courts use a factual analysis, considering both the number and kinds of acts involved, when determining whether the appointment of joint managing conservators is precluded. *See C.L.W.*, 2023 WL 5109878, at *9; *Hinojosa v. Hinojosa*, No. 14-11-00989-CV, 2013 WL 1437718, at *4 (Tex. App.—Houston [14th Dist.] Apr. 9, 2013, no pet.) (mem. op.).

"A single incident of abuse or violence may support, but does not compel, a finding under Section 153.004(b)." *C.L.W.*, 2023 WL 5109878, at *9; *see C.C. v. L.C.*, No. 02-18-00425-CV, 2019 WL 2865294, at *17 (Tex. App.—Fort Worth July 3, 2019, no pet.) (mem. op.) (concluding that single act may, but does not

37

conclusively, constitute "history of family violence" and explaining that "the word 'history' . . . leaves the trial court with the discretion to decide whether a parent's acts rise to the level of a history that disqualifies him or her from being appointed as a joint managing conservator"). The trial court may consider the participants' explanations of what occurred and the passage of time since the alleged incident when determining whether a history or pattern of abuse is shown. *See Alexander*, 247 S.W.3d at 762–63; *see also C.L.W.*, 2023 WL 5109878, at *9.

The party seeking to be appointed as sole managing conservator bears the difficult burden to rebut the joint-managing-conservatorship presumption. *Hinkle v. Hinkle*, 223 S.W.3d 773, 779 (Tex. App.—Dallas 2007, no pet.); *see also C.L.W.*, 2023 WL 5109878, at *9 (describing burden to rebut joint-managing-conservatorship presumption as "a weighty one"). Considering the policy interests involved, this burden is a heavy one. *See* TEX. FAM. CODE § 153.001(a)(1), (3); *C.L.W.*, 2023 WL 5109878, at *9.

## History or Pattern of Physical Abuse

In his first issue, Father argues that the trial court erred in appointing him and Mother as Corey's joint managing conservators because Section 153.004(b) expressly prohibits the appointment of both parents as joint managing conservators when credible evidence is presented of a history or pattern of past or present physical abuse by one parent directed against the other parent.

Father argues there is overwhelming evidence that Mother committed multiple acts that demonstrate a history or pattern of physical abuse against Father. He contends the trial court was not at liberty to disregard this evidence of physical abuse because Mother, who admitted she had "physically assaulted" Father "maybe" more than three times, but less than five times, conceded to engaging in some of the abusive conduct and other testimony regarding her abusive conduct was uncontradicted. Father argues that this same evidence demonstrates a "history of family violence," thus rebutting Family Code Section 153.131(b)'s presumption that the appointment of Mother and Father as joint managing conservators is in Corey's best interest.

Mother responds that the trial court did not err by appointing her and Father as joint managing conservators because trial courts have broad discretion to determine what constitutes credible evidence of a history or pattern of physical abuse under Section 153.004(b). To the extent there was conflicting evidence, she argues the trial court, as the sole finder of fact, resolved the conflicts in Mother's favor and we must defer to the trial court's assessments of witness credibility and its resolution of conflicting evidence.

A.    Analysis

In support of his argument that overwhelming evidence established a history or pattern of physical abuse by Mother against Father, Father cites certain evidence

outside the scope of the Section 153.004(b)'s inquiry—(1) the December 2020 incident during which Mother allegedly blocked Father's truck to prevent him from leaving the Walmart parking lot, (2) the September 2021 incident when Mother appeared at Father's home unannounced and banged on the windows, and (3) evidence that Mother's boyfriend's threatened to beat up Father. While this evidence may be probative for other aspects, including the child's best interest determination and whether the December 2020 and September 2021 demonstrate there is a history of family violence as set forth in Section 151.131(b), it is not evidence of a history or pattern of physical abuse by Mother against Father that limited the trial court's discretion to name Mother a joint managing conservator under Section 153.004(b). *See* TEX. FAM. CODE § 153.004(b). The actions of Mother's boyfriend are not relevant to our 153.004(b) inquiry, and there is no evidence that Mother engaged in any physical abuse during the Walmart incident in December 2020 or when she went to Father's home in September 2021 because it is undisputed that Mother did not touch or otherwise physically contact Father during these incidents. *See id.* (stating appointment of both parents as joint managing conservators prohibited "if credible evidence is presented of a history or pattern of

40

past or present . . . physical . . . abuse by one parent directed against the other parent, a spouse, or a child").[4]

Father separately points to evidence of (1) the May 2020 incident when Mother attempted to grab Father's cell phone from him, (2) the October 2020 incident at Sally's home where Mother slapped Father in the chest, and (3) the July 2021 incidents when Mother left Corey alone in her car and later tried to pull on Corey's arms and legs when Father tried to leave with Corey.

### 1.    May 2020

With respect to the May 2020 incident involving Father's cell phone, Mother testified that she and Father got into a fight that morning while Corey was present because she suspected Father was cheating on her.  According to Mother, Father had threatened to take Corey if she left, so she wanted proof of his cheating. When asked if she "admitted to tackling [Father] and being the aggressor on May 10th of 2020

---

[4]    Evidence that Mother's boyfriend threatened to beat up Father is also not evidence of family violence because Mother's boyfriend is not a member of Father's family or household.  *See* TEX. FAM. CODE § 71.004(1) (defining family violence as "an act by a member of a family or household against another member of the family or household. . ."); *id.* § 71.005 (defining household as "a unit composed of persons living together in the same dwelling, without regard to whether they are related to each other"); *id.* § 71.003 (stating definition of family "includes individuals related by consanguinity or affinity, as determined under Sections 573.022 and 573.024, Government Code, individuals who are former spouses of each other, individuals who are the parents of the same child, without regard to marriage, and a foster child and foster parent, without regard to whether those individuals reside together").

because you were wanting to see his phone," Mother testified that Father "fought back and we both fought," and "[w]e both participated in that."

Evidence of "altercations and confrontations" does not automatically prevent a trial court from appointing joint managing conservators. *See C.L.W.*, 2023 WL 5109878, at *10. Moreover, the trial court had discretion to determine that Father's testimony, even if true, was not a history or pattern of physical abuse that disqualified Mother from being a joint managing conservator. *See id.* (stating "the trial court had broad discretion to determine what constitutes credible evidence of a history or pattern of physical abuse under Section 153.004(b)"); *Lowth v. Lowth*, No. 14-03-00061-CV, 2003 WL 22996939, at *6 (Tex. App.—Houston [14th Dist.] Dec. 23, 2003, pet. denied) (mem. op.) (holding trial court reasonably could conclude that therapist's testimony he observed father "looming" over mother, and mother told him that father had pushed her twice did not rise to level of history or pattern of abuse).

### 2. October 2020

Father's mother, Sally, testified that in "'20, late '20, early '21," she called Mother and asked her to pick up Corey so that Sally could take Father to the hospital. According to Sally, when Mother arrived, she began "yelling" at Father and "slapping him around the chest." When asked if she had "witnessed these types of outbursts prior to this incident," Sally stated, "many times." But Sally did not testify

about the details or timing of these other "outbursts." *See* TEX. FAM. CODE § 153.004(a) (stating court shall consider evidence of intentional use of abusive physical force "committed within a two-year period preceding the filing of the suit or during the pendency of the suit").[5]

Sally was the only witness questioned at trial regarding the incident at her home. But the factfinder, as the sole judge of credibility, "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses." *City of Keller*, 168 S.W.3d at 820; *see also In re R.S.*, 2020 WL 3393069, at *6 (stating "an appellate court must afford great deference to the factfinder on issues of credibility and demeanor" when reviewing custody issues). Moreover, even if the trial court considered this incident in its conservatorship determination, it had the discretion to determine that the incident did not constitute credible evidence of a history or pattern of abuse. *See Jackson v. Jackson*, No. 05-01-01719-CV, 2002 WL 31513388, at *1

---

[5] When asked how many times she had "physically assaulted" Father, Mother testified at trial that she was not sure, but it was no more than five times, but maybe more than three times. And Father, who did not testify at trial about the May 2020 incident, testified that Mother had lost her temper and physically harmed him "three or four different times" in front of Corey. To the extent Father contends these are incidents separate from those identified by dates in his brief, and discussed here, there was no testimony about the timing of these other incidents or evidence that they were "committed within a two-year period preceding the filing of the suit or during the pendency of the suit." *See* TEX. FAM. CODE § 153.004(a) (stating court shall consider evidence of intentional use of abusive physical force "committed within a two-year period preceding the filing of the suit or during the pendency of the suit").

(Tex. App.—Dallas Nov. 13, 2002, no pet.) (mem. op., not designated for publication) (holding trial court had discretion to determine uncontroverted evidence father "pushed or shoved" mother several times was not credible evidence of history or pattern of abuse).

### 3. July 2021

Father argues that Mother engaged in family violence after Corey's medical appointment and swim lessons in July 2021. According to Father, Mother "began screaming" at him in front of Corey after Corey's medical appointment and she "became enraged [when Father was putting Corey in his car seat] and [Mother] physically removed the child from [his] truck by pulling on [Corey's] arms and legs." Father argues that after they attended Corey's swim lessons later that day, Mother "kept [Father] from closing and locking his door" to prevent him from leaving with Corey, and "[w]hile [Father] was holding their two-year-old child, [Mother] violently grabbed [Corey's] arms and legs while the child cried and screamed."

There is no evidence in the appellate record supporting Father's claims that Mother was "screaming" or "enraged or had "violently grabbed [Corey's] arms and legs while the child cried and screamed."[6] There is also conflicting evidence on this

---

[6] Father cites to testimony from the October 2021 temporary hearing transcript. Even if we were to consider Father's testimony during the temporary hearing, which is

44

point. At trial, Mother testified that she and Father took Corey to his medical appointment in July 2021, and they argued after the appointment. Father, who was scheduled to take possession of Corey, tried to put Corey in his car seat after his swim lessons. Mother testified that she physically removed Corey from his car seat because she did not want Corey to leave with Father. When asked if she had been "pulling at [Corey's] arms and legs as [Father] was trying to put [Corey] in the car seat," Mother testified that she "may have been." Mother admitted that she testified during the temporary orders hearing that she "blacked out" during this incident.

Father argues that evidence Mother left Corey alone in her car that same day also demonstrates a history or pattern of physical abuse. According to Father, Mother left Corey in her car for twenty minutes "without the air conditioning turned on because she was arguing" with Father after Corey's medical appointment, and she did not turn the air conditioning on until Father noticed that Mother's car was not running and he "informed [Mother] of the safety concern." There is no evidence

---

outside the appellate record, it would only create a conflict in the evidence for the trial court to resolve and, as the sole factfinder, it was the trial court's province to resolve any conflicts or inconsistencies in the evidence and the court was entitled to credit Mother's testimony regarding the incident over Father's testimony. *See Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (stating factfinder resolves conflicting evidence and reviewing court must presume that it did so in favor of prevailing party if reasonable trier of fact could resolve conflicting evidence either way); *see also City of Keller*, 168 S.W.3d at 819 (stating trial court, as sole factfinder in bench trial, is sole judge of credibility of witnesses, weight to be given their testimony, and may accept or reject all or any part of their testimony).

in the appellate record supporting Father's assertions that Corey was left alone in the car for twenty minutes or that Mother only became aware of the situation after Father brought the matter to her attention. Mother denied leaving Corey in the car without air conditioning to argue with Father that day, but she acknowledged she had done so one time after Corey's medical appointment. No other witness testified at trial about the incident.

Nothing in the record suggests that the trial court failed to consider Father's testimony on this point. After considering the parties' testimony, the trial court had wide discretion to determine that Father's testimony, even if true, did not establish a history or pattern of physical abuse disqualifying Mother from being appointed as a joint managing conservator. *See C.L.W.*, 2023 WL 5109878, at *10 (stating trial court has discretion to determine whether evidence demonstrates "a history or pattern of physical abuse that disqualified [parent] from being a joint managing conservator").

## B. History of Family Violence

Father argues that the December 2020 and September 2021 incidents also demonstrate a "history of family violence," thus removing Family Code Section 153.131(b)'s rebuttal presumption that the appointment of Mother and Father as joint managing conservators is in Corey's best interest.

### 1. December 2020

Father testified that in December 2020, Mother was "yelling and making threats towards [him] in the presence of the child" and once he was able to leave the Walmart parking lot, she followed his truck out of the parking lot and began "driving erratically and honking the horn," which prompted him to pull over to ensure that Corey was safe. Father testified that Mother stood in front of his truck to prevent him from leaving.

Citing to *Boyd v. Palmore*, 425 S.W.3d 425 (Tex. App.—Houston [1st Dist.] 2011, no pet.), Father argues that Mother committed family violence when she "blocked [his] vehicle to prevent him from leaving for approximately 1.5 hours." Father's reliance on *Boyd* is misplaced. In *Boyd*, the court held that the appellant committed an act of family violence when he blocked the appellee's car with his body and jumped on the hood of the car and the appellee testified that "she feared for her life during this incident and reported it to the police." *Id.* at 427–28, 430–31. Unlike in *Boyd*, there is no evidence that Mother jumped on Father's truck or that Father feared for his safety during the incident. Furthermore, Mother denied standing in front of Father's truck and testified that she merely stood beside Father's truck while they spoke. As the sole factfinder, it was the trial court's province to resolve any conflicts or inconsistencies in the evidence and we defer to the trial court's resolution of these issues. *See Jordan*, 325 S.W.3d at 713 (stating factfinder

47

resolves conflicting evidence and reviewing court must presume that it did so in favor of prevailing party if reasonable trier of fact could resolve conflicting evidence either way); *see also City of Keller*, 168 S.W.3d at 819 (stating trial court, as sole factfinder in bench trial, is sole judge of the credibility of witnesses, weight to be given their testimony, and may accept or reject all or any part of their testimony).

### 2. September 2021

Father also argues that in September 2021, after drinking alcohol, Mother drove three hours to his home during the night, and when she arrived at around 4 or 5 a.m., Mother "proceeded to circle the house while knocking on doors and windows." According to Father, he "asked [Mother] to leave repeatedly and attempted to calm her down for over two hours," and when Mother refused to leave, he threatened to call the police "because he did not want [Corey] to witness yet another emotional scene." He claims that although Mother agreed to leave, she "started hitting doors and windows in an attempt to get [Corey's] attention." Father did not testify at trial about this incident, and many of the facts he relies upon are from evidence that as previously discussed is not included in the appellate record.

At trial, Mother testified that after arriving at Father's home around 4 or 5 a.m., or possibly 2 a.m., she lightly tapped on the windows to get Corey's attention because she wanted Corey to see that she was there. Mother testified that she did not go inside Father's house, and she denied banging on the windows. When asked

48

if she believed that she was in a hypomanic state that morning, Mother testified that she was in distress because it was traumatizing to see her son inside the home where she had lived with Corey and Father as a family and to be unable to go inside the home and touch Corey.

Relying on *Jackson v. Jackson*, No. 01-14-00952-CV, 2015 WL 8940117 (Tex. App.—Houston [1st Dist.] Dec. 15, 2015, no pet.) (mem. op.), Father argues that Mother's threatening behavior in September 2021 constitutes family violence. Father's reliance on *Jackson* is misplaced. In *Jackson*, the husband went to his wife's home at night uninvited, banged on the windows, and then "proceeded to break into her home." *Id.* at *4. The wife testified that this "caused her considerable fear and prompted her to contact both her daughter and her neighbor so that they might call the police." *Id.* The court concluded that the husband's conduct that night, the wife's "summoning of the police, and [the wife's] testimony about her fearfulness" provided legally sufficient evidence supporting the trial court's finding that the husband committed "'an act . . . that [was] a threat that reasonably placed [the wife] in fear of imminent physical harm, bodily injury, [or] assault,' thereby satisfying the definition of 'family violence.'" *Id.*; TEX. FAM. CODE § 71.004(1) (defining family violence to include "a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault"). Although a "threat that reasonably places the member in fear of imminent physical harm, bodily injury, [or]

49

assault," also satisfies the definition of family violence, unlike in *Jackson*, there is no evidence that anything Mother did on the morning of September 19, 2021 reasonably placed Father in "fear of imminent physical harm, bodily injury, [or] assault." TEX. FAM. CODE § 71.004(1) (defining family violence).

## C.    Conclusion

Because Sections 151.131 and 153.004 do not define "history" or "pattern," courts engage in a factual analysis, considering both the number and kinds of acts involved, to determine whether the appointment of managing conservators is precluded. *See C.L.W.*, 2023 WL 5109878, at *9; *C.C.*, 2019 WL 2865294, at *17 (stating trial court has "discretion to decide whether a parent's acts rise to the level of a history [of family violence under Section 153.131(a)] that disqualifies him or her from being appointed as a joint managing conservator"). A trial court may consider the participants' explanations of what occurred, and the time elapsed since the alleged incident, to determine whether a history or pattern of abuse is shown. *C.L.W.*, 2023 WL 5109878, at *9. The record here establishes that the trial court engaged in that factual analysis.

Except for the incident involving Mother's boyfriend in January 2023, all of the incidents Father relies upon to demonstrate a history or pattern of physical abuse or a history of family violence occurred before the October 2021 temporary orders hearing. The trial court emphasized to the parties at the outset of trial on September

50

8, 2023, that he was most interested in the events transpiring after the October 2021 hearing. At the conclusion of trial, the trial judge told Mother:

> I was pretty hard on you at the last temporary orders hearing because your conduct was nuts. You scared me. And I quite frankly, didn't have much belief or hope that things were going to be significantly different if you want to know the truth. I came into this thinking this was going to be easy. Well, you made it hard because you've done pretty good. You haven't done perfect, but you've done pretty damn good. You've owned up to your screw-ups. You've focused on getting your life straight. You've done good. That's all I can say about it.

The trial court found that although Mother had "wrestled with [Father] or fought with [Father] on several occasions. . . [t]hese events occurred early on in the divorce before [Mother] received counseling and treatment." The trial court also heard extensive testimony at trial regarding Mother's medical treatment and therapy after the October 2021 temporary orders hearing, and it was in the best position to evaluate Mother's credibility, assess the efficacy of her medical and psychological treatment after these incidents, and determine that in light of her intervening treatment, Mother's conduct prior to the did not rise to the level of a "history of family violence" or a "history" or "pattern" of physical abuse that disqualified her from being appointed as Corey's joint managing conservator. *See In re R.S.*, 2020 WL 3393069, at *6 (stating "an appellate court must afford great deference to the factfinder on issues of credibility and demeanor" when reviewing custody issues because trial court "'faced the parties and their witnesses, observed their demeanor,

51

and had the opportunity to evaluate the claims made by each parent'") (quoting *In re J.R.D.*, 169 S.W.3d at 743).

Even assuming there is sufficient evidence that one or more of the incidents on which Father relies constitutes some evidence of physical abuse or family violence, the trial court had discretion to determine whether there was credible evidence establishing a "history of family violence" or a "history" or "pattern" of physical abuse. Because the court was at liberty to consider the participants' explanations and the time that elapsed since the purported incidents in making its conservatorship decision, we cannot conclude that Section 143.004(b) precluded the appointment of Mother as a joint managing conservator. *See Alexander*, 247 S.W.3d at 762–63; *C.L.W.*, 2023 WL 5109878, at *9; *see also C.C.*, 2019 WL 2865294, at *17 (concluding that single act may, but does not conclusively, constitute "history of family violence" and explaining that "the word 'history' . . . leaves the trial court with the discretion to decide whether a parent's acts rise to the level of a history that disqualifies him or her from being appointed as a joint managing conservator"); *Lowth*, 2003 WL 22996939, at *6 (holding trial court reasonably could conclude that evidence of one "looming" incident, two pushing incidents, and one incident of father threatening mother did not rise to level of history or pattern of abuse); *Jackson*, 2002 WL 31513388, at *1 (holding trial court had discretion to determine

uncontroverted evidence father "pushed or shoved" mother several times was not credible evidence of history or pattern of abuse).

To the extent the testimony regarding the alleged incidents was inconsistent or contradictory, it was the province of the trial court to resolve any conflicts or inconsistencies in the evidence and the court was at liberty to accept or reject all or any part of a witness's testimony. *See City of Keller*, 168 S.W.3d at 819–20 (stating trial court, as sole factfinder in bench trial, is sole judge of credibility of witnesses, weight to be given their testimony, and may accept or reject all or any part of their testimony and "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses"); *see also In re R.S.*, 2020 WL 3393069, at *6 (stating "an appellate court must afford great deference to the factfinder on issues of credibility and demeanor" when reviewing custody issues because trial court "'it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent'") (quoting *In re J.R.D.*, 169 S.W.3d at 743).

We conclude there is some evidence supporting the trial court's negative findings of a history or pattern of physical abuse and a history of domestic violence. Although there is some evidence to the contrary, we cannot say that the court's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *In re J.J.G.*, 540 S.W.3d

at 62. The court thus had sufficient information on which to exercise its discretion, and based on the evidence presented at trial, we cannot say that the trial court's findings that there was no credible evidence of a history or pattern of physical abuse, or a history of family violence were unreasonable. *See In re J.J.G.*, 540 S.W.3d at 55.

We overrule Father's first issue.

## Significant Impairment

In his second issue, Father argues the trial court erred by appointing Mother and Father as Corey's joint managing conservators and naming Mother as the parent with the exclusive right to designate Corey's primary residence and make educational decisions because the evidence demonstrated that Mother posed a risk of significant impairment to Corey's physical health or emotional development, thus rebutting the presumption that appointment of the parents as joint managing conservators was in Corey's best interest. Mother responds that the trial court did not err because Father failed to rebut the parental presumption that appointment of both parents as joint managing conservators is in the child's best interest with credible evidence of significant impairment.

### A. Applicable Law

Subject to Section 153.004, "unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the

appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." TEX. FAM. CODE § 153.131(a). To support a finding of significant impairment, the evidence "must do more than merely raise a suspicion or speculation of possible harm." *In re M.O.*, No. 05-19-00413-CV, 2019 WL 4071999, at *2 (Tex. App.—Dallas Aug. 29, 2019, no pet.) (mem. op.). The evidence must support the logical inference that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions, will probably harm the child. *Id.*

"Impairment of the child's physical health or emotional development must be proved by showing that specific acts or omissions of the parent demonstrate that awarding her conservatorship would result in physical or emotional harm to the child." *In re C.L.J.S.*, No. 01-18-00512-CV, 2018 WL 6219615, at *4 (Tex. App.— Houston [1st Dist.] Nov. 29, 2018, no pet.) (mem. op.). Acts or omissions that may constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent. *In re B.B.M.*, 291 S.W.3d 463, 469 (Tex. App.—Dallas 2009, pet. denied); *see also In re C.L.J.S.*, 2018 WL 6219615, at *4. "Other considerations may include parental irresponsibility, mental health problems, frequent moves, bad judgment, and an unstable lifestyle." *See In re C.L.J.S.*, 2018 WL 6219615, at *4. The time

period to assess parental fitness is the present. *In re S.T.*, 508 S.W. 3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). There must be a link between the parent's conduct and harm to the child. *See id.* "A factfinder may infer the present fitness of the parent to be managing conservator from the parent's recent, deliberate past misconduct." *In re M.O.*, 2019 WL 4071999, at *2 (citing *R.H. v. D.A.*, No. 03-16-00442-CV, 2017 WL 875317, at *2 (Tex. App.—Austin Mar. 2, 2017, pet. dism'd) (mem. op.)). However, evidence of a parent's past misconduct, standing alone, may not be sufficient to show present unfitness. *See In re M.O.*, 2019 WL 4071999, at *2.

Courts may also consider the following non-exclusive factors when determining whether a parent's conservatorship is in the child's best interest: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.

1976); *see In re J.J.G.*, 540 S.W.3d at 56–57 (using *Holley* factors to ascertain best interest of child in conservatorship case).

## B.    Analysis

The record reflects that Mother is a loving and caring parent who has maintained stable employment and housing since at least August 2022 when she began working as an administrative assistant at Texas A&M University. Her employer provides her with health insurance, life insurance, disability insurance, and retirement benefits. *See Holley*, 544 S.W.2d at 372 (recognizing stability of home and ability to provide for child's current and future physical and emotional needs as best-interest factors). The record also established that Mother has been in therapy for over two years, that she will continue to participate in therapy, and that she has successfully reached an optimum medication regimen with her primary physician, Dr. Waguespack. She also has an extensive support system in Grimes County, including her parents, grandfather, numerous aunts and uncles, cousins, and close family friends who will continue to support her and Corey. Although Mother and Father raised Corey together prior to Mother's filing her petition in June 2020, Mother had been primarily responsible for caring for Corey. *See* TEX. FAM. CODE § 153.134(a)(4) (identifying "whether both parents participated in child rearing before the filing of the suit" as best interest factor).

57

When asked what she would do going forward to be a better parent to Corey, Mother testified that she would continue going to therapy because she feels it will still take effort on her part to be able to be "a good co-parent and to get over the learning curve of co-parenting and telling [Father] things." Mother testified that regardless of whether Corey lived with her or Father, she wanted the court to include an electronic communication provision in the final order because "it is very important to have contact with the other parent, especially when you're not with them" and she believed it was "very important that [Corey] spend time with both of his parents." *See* TEX. FAM. CODE § 153.134(a)(3) (identifying "whether each parent can encourage and accept a positive relationship between the child and the other parent" as best interest factor).

Father argues that overwhelming, credible evidence was presented at trial demonstrating how Mother's conduct significantly impaired Corey's emotional health and physical well-being "by continuing to commit actions of family violence in the presence of the child, leaving the child in a hot car, refusing to take medications as prescribed, refusing to acknowledge her mental illness or seek appropriate treatment, and failing to meaningfully attempt positive co-parenting with [Father] over the course of two years." Most of the evidence Farther relies upon, however, concerns events that occurred before the temporary orders hearing in October 2021. There is no evidence of any incidents of alleged physical abuse or

58

family violence by Mother after October 2021. *See In re S.T.*, 508 S.W. 3d at 492 (stating period to assess parental fitness is present).

Although Mother admitted to not taking her medications as prescribed in 2020, Dr. Waguespack has been her primary physician since March 2021, and there is no indication that Mother failed to comply with his orders. Mother also testified that the therapy she receives from Benson, in conjunction with the medication prescribed by Dr. Waguespack, has helped her "tremendously" in dealing with her feelings towards Father and she believes that her work with Dr. Waguespack and Benson is helping her become a better person and a better parent. *See In re L.D.F.*, 445 S.W.3d 823, 831 (Tex. App.—El Paso 2014, no pet.) (stating "the trial court is in the best position to observe the witnesses and feel the forces, powers, and influences that cannot be discerned by merely reading the record, and therefore defer to its assessments, particularly in mental health cases, where those findings are not an abuse of discretion") (internal quotations omitted).

Both Mother and Father recognize that they need to do a better job of communicating with one another regarding Corey. Although Mother struggled to successfully co-parent with Father in the past, the record reflects that Mother is committed to continuing to work on her co-parenting skills and improving her relationship with Father for Corey's sake.

There is thus some evidence supporting the trial court's finding that Mother's appointment as Corey's joint managing conservator would not significantly impair Corey's physical health or emotional development. *See City of Keller*, 168 S.W.3d at 810–11. While there is some evidence to the contrary, including testimony that Corey acted out when he returned from Mother's home, we cannot say that the court's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176; *In re J.J.G.*, 540 S.W.3d at 62. The court thus had sufficient information on which to exercise its discretion, and based on the evidence presented at trial, we cannot say that the trial court's finding of no significant impairment was unreasonable. *See In re J.J.G.*, 540 S.W.3d at 55.

We overrule Father's second issue.

## Judicial Bias

In his third issue, Father argues the trial court was biased against him and thus deprived him of a fair and impartial trial in violation of his right to due process. Mother argues that Father waived any error because he did not object in the trial court, and he failed to establish that the trial court's actions constituted fundamental error.

## A.      Judicial Bias and Impartiality

Parties have a right to a fair and impartial trial and one of the fundamental components of a fair trial is a neutral and detached judge. *Markowitz v. Markowitz*, 118 S.W.3d 82, 86 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Metzger v. Sebek*, 892 S.W.2d 20, 37 (Tex. App.—Houston [1st Dist.] 1994, writ denied)); *see also Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.) ("All parties have a right to a fair and impartial trial before a neutral judge."). "In the absence of clear proof to the contrary, we presume a trial judge is impartial and unbiased." *Place v. McCoy*, No. 01-20-00186-CV, 2021 WL 3500989, at *5 (Tex. App.—Houston [1st Dist.] Aug 10, 2021, no pet.) (mem. op.).

A trial court has broad discretion to conduct a trial and may express itself in exercising this discretion. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001). That discretion permits a trial court to "intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time." *Id.* at 241; *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (stating trial court has inherent power to control disposition of cases "with economy of time and effort for itself, for counsel, and for litigants"); TEX. R. EVID. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for

determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment.").

Remarks made by the judge "during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," nor do "expressions of impatience, dissatisfaction, annoyance, and even anger" establish bias or partiality. *Dow Chem.*, 46 S.W.3d at 240 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Rather, reversible bias or partiality is shown if the judge's conduct showed "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555.

Judicial rulings alone are rarely sufficient to demonstrate judicial bias or impartiality. *See Dow Chem.*, 46 S.W.3d at 240. Indeed, "[i]t is only in the rarest circumstances . . . that judicial rulings demonstrate the degree of favoritism or antagonism necessary to show that a fair and impartial trial was not possible." *Ellason*, 162 S.W.3d at 887; *see also In re E.M.*, No. 02-18-00351-CV, 2019 WL 2635565, at *3 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.) ("Allegations that a judge has put his or her thumb on the scale should not be made simply because a party disagrees with the judge's rulings.").

We will only reverse a judgment on the ground of improper conduct or comments if we find (1) that judicial impropriety was in fact committed and (2)

probable prejudice to the complaining party. *Markowitz*, 118 S.W.3d at 86 (citing *Metzger*, 892 S.W.2d at 39). The complaining party bears the burden of showing harm to warrant reversal. *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009) (citing TEX. R. APP. P. 44.1(a)).

## B.    Preservation

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. TEX. R. APP. P. 33.1(a)(1)(A). There is a limited exception to the preservation rules for certain "fundamental" errors, including "those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006).

Although not framed in terms of fundamental error, the Texas Supreme Court has recognized that a party need not object in the trial court to preserve a claim of judicial bias if the conduct or comment is not curable. *See Dow Chem.*, 46 S.W.3d at 241 (stating objection not required to preserve claim of judicial bias if "the conduct or comment cannot be rendered harmless by proper instruction"); *In re L.S.*, No. 02-17-00132-CV, 2017 WL 4172584, at *16 (Tex. App.—Fort Worth Sept. 21, 2017, no pet.) (mem. op.) (stating "if a trial judge's conduct or comments are

incurable, the failure to object may be excused"). "This limited, narrow, and rare exception to the preservation-of-error requirements in civil cases essentially requires a harm analysis—the error probably caused the rendition of an improper judgment—to determine if the error was incurable and, therefore, not subject to waiver." *In re L.S.*, 2017 WL 4172584, at \*16 (internal quotations omitted). In other words, "if a judge's bias and prejudice as shown on the face of the record were harmful, thereby depriving a litigant of his important constitutional right to a fair trial with an impartial fact-finder and resulting in an improper judgment, then a party's failure to object does not waive the complaint." *Id.*

## C.    Analysis

Father argues that the trial judge's conduct and comments throughout the pendency of the case and during trial demonstrate that the judge was biased against him. In support of his claim of judicial bias, he argues the trial court (1) failed to find a history of family violence, (2) refused to order Mother to pay child support on temporary orders, (3) did not order Mother to reimburse Father for health insurance premiums he paid during the pendency of the case, (4) sustained three of Mother's "improper objections" during trial, (5) allowed Mother's counsel to "interrupt and make statements as though [Mother's] counsel were testifying," (6) refused to "review critical exhibits," (7) exchanged emails with Mother's counsel during the pendency of the case regarding settings or the judge's opinions regarding hearings

without insuring that Father's counsel received a copy of the emails, (8) failed to set an emergency hearing promptly for temporary orders upon Father's request, (9) stated that Davila's proposed testimony was "not going to make a hill of a beans of difference," and (10) allowed Mother to "monopolize almost the entire day allotted for trial, severely limiting [Father's] ability to put on his case by giving him less than an hour before ruling."

Many of these facts concern the trial court's rulings and its discretionary decisions about how to manage its docket and control its courtroom, including the timing of the hearing on temporary orders, the trial court's rulings as reflected in the temporary orders, and the trial court's rulings on some of Mother's objections at trial. None of these alleged facts reflect a "deep-seated favoritism or antagonism" on the part of the judge against Father sufficient to demonstrate judicial bias.[7] *See Liteky*, 510 U.S. at 555; *Dow Chem.*, 46 S.W.3d at 241 (stating trial court has broad discretion to conduct trial, including discretion to "intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time"); *Ellason*, 162 S.W.3d at 887 (stating "[i]t is only in the rarest circumstances . . . that judicial rulings demonstrate the degree of favoritism or antagonism necessary to show that a fair and impartial trial was not possible").

---

[7] Although Father complains that the trial court abused its discretion by failing to make a finding of family violence, we have already overruled Father's issue on this point.

Father also complains that the trial court judge demonstrated bias by allowing Mother to "monopolize almost the entire day allotted for trial, severely limiting [Father's] ability to put on his case by giving him less than an hour before ruling." The record reflects that the trial began at 9:30 a.m. with an hour and a half for lunch. The trial court informed the parties at the outset of trial that he wanted to conclude the trial by 5 p.m., but he would continue after 5 p.m. if warranted. The judge also kept the parties apprised throughout the day of how much time Mother had used to present her case. Father never objected to Mother's use of her time or expressed concern that he would not have enough time to adequately present his case by 5 p.m. By the time Mother rested her case and Father was allowed to present his, two of Father's available witnesses had testified—Mother and Father. Father also was allowed to call his mother Sally to testify without limitation or pressure from the trial court with regard to the time expended. Although questioning the necessity and usefulness of Davila's testimony after Father informed the trial court of the substance of Davila's proposed testimony and stating that Davila's testimony "wouldn't make a hill of difference," the trial court nevertheless allowed Davila to testify. *See Dow Chem.*, 46 S.W.3d at 240 (stating "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality). Rather than calling Davila, Father's counsel suggested that the court rely on Davila's letter, which addressed some of the topics Davila would have testified about. The

letter was admitted into evidence as RX 36. *See* TEX. R EVID. 611(a) (stating trial courts "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . avoid wasting time").

Although Father's counsel only had an hour to present Father's case, Father's counsel called one witness to testify (Sally), had the opportunity to call a second witness (Davila), was able to examine Mother and Father, and did not attempt to call any additional witnesses. There is also no indication that the trial court judge, who had stated he would allow the trial to continue past 5 p.m. if needed, would not have allowed Father to proceed to present his case. While Mother was allowed more time than Father to present her case, none of the alleged limitations placed on Father's ability to present his case reflect a "deep-seated favoritism or antagonism" on the part of the judge against Father and are sufficient to demonstrate judicial bias. *See Liteky*, 510 U.S. at 555; *see also Office of Pub. Util. Counsel v. Pub. Util. Comm'n*, 185 S.W.3d 555, 574 (Tex. App.—Austin 2006, pet. denied) ("A decisionmaker exhibits impermissible bias when '[t]he bias . . . come[s] from an extrajudicial source and result[s] in an opinion on the merits of the case other than what the judge learned from participating in the case.'") (quoting *Rosas v. State*, 76 S.W.3d 771, 774 (Tex. App.—Houston [1st Dist.] 2002, no pet.)). Father also has not identified any evidence he would have presented had he been allowed more time for trial. Nor has he explained how the unequal division of time or the trial court's questioning of the

usefulness of Davila's testimony resulted in the rendition of an improper judgment or prevented Father from properly presenting his case on appeal. *See* TEX. R. APP. P. 44.1(a); *see Ford Motor Co.*, 279 S.W.3d at 667 (stating complaining party has burden to show harm on appeal).

As further evidence of judicial bias, Father argues that throughout the trial "the trial court often would email [Mother's] counsel directly regarding settings or [the trial judge's] opinions regarding hearings, frequently failing to include [Father's] counsel's correct email address, and addressing [Father's] counsel by the wrong name." Father, who contends that most of these exchanges are not included in the record, relies on an email exchange attached to a September 28, 2023 letter his counsel sent to the trial judge. In her letter, Father's counsel states she was "unaware that letters and emails directly to the Court were the preferred method of communication over formally filing motions," and she requested "guidance to ensure that the letters and emails, which appear to be acting as motions and orders, are put into the record." Father's counsel attached an email exchange beginning on September 26, 2023 to which the clerk's office attached an order denying Father's motion to modify the judgment and stay the effect of rulings. Father's counsel responded to the clerk's email, and copied Mother's counsel, and asked if the trial court was "refusing to hear this motion," and reiterating Father's counsel's request for a hearing date. The clerk forwarded the email to the trial judge who responded

68

directly to Father's counsel, copying Mother's counsel. In his September 28, 2023 email to Father's counsel, the trial judge, who misspelled Father's counsel's name, explained that the request for a hearing did not comply with the court's policies which are available on the court's website, and even if he had been aware of the request for a hearing when he denied Father's motion, he "most likely" would not have set the motion for a hearing because he "does not always set motions for argument if [he] consider[s] them without merit or premature or when there is not time to set the request for hearing," and he explained why he denied Father's motion. Father does not argue that his counsel was deliberately excluded from any communications between the trial judge and Mother's counsel. Instead, Father argues that the trial judge misspelled his counsel's name and failed to use his counsel's correct email address, thus preventing his counsel from receiving a copy of all the communications. Mistakenly sending an email to the wrong address or misspelling counsel's name does not show "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555; *see also Place*, 2021 WL 3500989, at *5 ("In the absence of clear proof to the contrary, we presume a trial judge is impartial and unbiased.").

Father's complaint that the trial court refused to "review critical exhibits" is also unavailing. After Mother asked the trial court to consider Davila's letter, which was admitted as Respondent's Exhibit 36, the trial court agreed to do so and stated,

"Although, I wonder if y'all really want me to sit down and read all this. Y'all might not get a ruling until sometime in December."  According to Father, the "trial court then proceeded to ignore all of the exhibits."  But there is no indication in the record that the trial court failed to consider the exhibits before issuing its final order on November 30, 2023, two and a half months after trial.  *See Place*, 2021 WL 3500989, at *5 (stating appellate courts presume trial judge is "impartial and unbiased" unless presented with "clear proof to the contrary").

We conclude that Father failed to demonstrate that the trial court was biased against him, and thus deprived him of a fair and impartial trial in violation of his right to due process.  We overrule Father's third issue.

## Conclusion

We affirm the trial court's final order.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

70